### IN THE UNITED STATES DISTRICT COURT FOR THE
### EASTERN DISTRICT OF OKLAHOMA

**PHILLIP WARREN TUCKER, SR.,**

        **Plaintiff,**

**v.**                                          **Case No. 19-CV-025-JFH-SPS**

**JOE ALLBAUGH, et al.,**

        **Defendants.**

### OPINION AND ORDER

This action is before the Court on Defendants' motion to dismiss or for summary judgment. The Court has before it for consideration Plaintiff's amended complaint [Dkt. No. 41], Defendants' motion [Dkt. No. 47], Plaintiff's response to the motion [Dkt. No. 52], Defendants' reply [Dkt. No. 54], and an amended special report, prepared by the Oklahoma Department of Corrections ("DOC") at the direction of the Court, in accordance with *Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978) [Dkt. Nos. 45, 46].

Plaintiff is a pro se state prisoner who is incarcerated at Jackie Brannon Correctional Center ("JBCC") in McAlester, Oklahoma. He brought this action under the authority of 42 U.S.C. § 1983, seeking relief for alleged constitutional violations during his incarceration at JBCC. The defendants are Joe Allbaugh, former DOC Director, and the following JBCC officials: Warden Greg Breslin; Sgt. Christopher Williamson; Cpl. Michael Riley, a.k.a. Mikel Riley; Lt. Jesse Smith; Lt. Leta Stotts; and Lt. Brenda Williamson ("Defendants").

**Motion to File Second Amend Complaint**

On October 23, 2020, Plaintiff filed a motion to file a second amended complaint, along with a prolix proposed second amended complaint [Dkt. No. 65].  He also filed a motion to file an extended brief [Dkt. No. 66].  The proposed second amended complaint names the same defendants as in the first amended complaint.  Plaintiff, however, is asking to add additional allegations, some of which arose after the special report and Defendants' motion to dismiss were filed on May 11, 2020 [Dkt. No. 45, 46, 47].

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a "*short and plain statement of the claim showing that the pleader is entitled to relief . . . .*" (emphasis added). Plaintiff's proposed second amended complaint is 61 pages long, and he also is proposing to file an "extended" brief.  After careful review, the Court finds the proposed amended complaint is substantially noncompliant with Rule 8.  Further, the Court will not allow Plaintiff to repeatedly amend his complaint to introduce new theories in an attempt to avoid dismissal of the case.  *See Anderson v. Herbert*, No. 2:13-CV-211, 2014 WL 6769907, at *2 (D. Utah 2014) (Dec. 1, 2014) (unpublished).  Therefore, Plaintiff's motions to file a second amended complaint [Dkt. No. 65] and his motion to file an extended brief [Dkt. No. 66] are **DENIED**.  Plaintiff, however, may submit his new allegations in a new civil rights complaint pursuant to 42 U.S.C. § 1983.

**Plaintiff's Allegations**

Plaintiff raises the following claims in his rambling and repetitive amended complaint:

**Claim One:**  Prison officials violated the First Amendment by retaliating against prisoners who complain about the DOC and the conditions of confinement.  Plaintiff claims that when he reported officials' misconduct and the allegedly inhumane conditions, prison officials retaliated to

the point of a campaign of harassment.  On October 23, 2018, Defendant Riley ordered Plaintiff to take down his wet laundry that had been returned wet from the Oklahoma State Penitentiary ("OSP") laundry facility.  The laundry was sent to OSP, because JBCC had no laundry facilities. Plaintiff alleges his laundry was regularly returned soiled and wet, and he has complained about it since his arrival at JBCC in December 2017.  If he had stored the wet clothing, it would have soured.

When Plaintiff asked to speak to Riley's supervisors, Defendants Stotts, Christopher Williamson,[1] and Smith, Riley threatened to conduct a search and seizure of Plaintiff's housing pod.  Plaintiff considered the threat to be retaliatory and an attempt to stop his grievance process and to incite violence against him by other prisoners.

Plaintiff asked Defendant Williamson to call the supervisors, however, Plaintiff was told that the supervisors were refusing to speak to Plaintiff, and they knew the laundry was being returned wet.  Plaintiff claims Defendants Riley and Williamson then searched the pod in retaliation or as punishment.  The next day, Plaintiff spoke with Unit Manager Todd Welch, who said he would speak to the other officers.  After Welch spoke with the officers, another search allegedly was executed in retaliation.  The search, led by Defendant Stotts, lasted nearly an hour and resulted in Plaintiff's property being left in disarray.

Plaintiff next spoke to Defendant Stotts about the laundry and staff misconduct, however, Stotts claimed she could not do anything about it.  On November 13, 2018, Defendant Smith was notified about the laundry and staff misconduct, and Smith claimed there was nothing he could do.

---

[1]  The Court notes there are two defendants in this case with the last name of Williamson.  The amended complaint, however, does not consistently differentiate between them.

3

On December 7, 2018, and December 23, 2018, Plaintiff again spoke with Defendant Williamson, and she also claimed there was nothing she could do.  Plaintiff maintains the named supervisors have not acted to correct the alleged violations.

On December 19, 2018, after submitting several grievances to Defendant Warden Breslin, Plaintiff was brought to a meeting with Breslin.  Plaintiff detailed the reprisals by staff because of his grievances about lost laundry, missed meals, and unreasonable searches and seizures.  Warden Breslin admitted the laundry was a problem and said he was trying to purchase machines for the facility.  Breslin also said that Plaintiff's seized shirt would be replaced.  Breslin further stated that staff were not supposed to retaliate against prisoners, and he would speak to the staff about their misconduct.

Plaintiff alleges the warden's talk with the staff resulted in additional retaliation against him.  During the 6:00 p.m. count on December 22, 2018, Correctional Officer Williamson walked to Plaintiff's bunk and stated loudly, "I smell a rat!"  Plaintiff asserts that prisoners will severely injure or kill anyone they believe is an informer or snitch.  Plaintiff contends Williamson made this statement because Plaintiff had complained to the warden, deputy warden, warden's assistant, and unit manager about staff misconduct.

Plaintiff further alleges that in January 2019, the guards began to harass him and his coworkers at the library.  On January 10 and 11, dozens of books were knocked off the shelves, dumped out of boxes onto the floor, or moved to different shelves.  Each time, Plaintiff notified the library supervisor.  Afterward, when Plaintiff was checking out from work, Defendant Stotts searched him and ordered that he no longer would take any of his property to work, including his poncho, bowl, spoon, ice chest, and cup.  Prior to Plaintiff's grievances, bringing those items to

4

work was not a problem.

On February 7, 2019, while on a lunch break, Plaintiff allegedly discovered his property in complete disarray.  The television remote had been placed in another prisoner's area, his clothes were on the floor, and a cup of water had been knocked over.  Two other inmates told Plaintiff that Officer David Kendricks, who worked closely with Defendants Riley and Williamson, was responsible for the state of Plaintiff's cell.  Plaintiff speculates that Kendricks' motivation could have been related to Plaintiff's complaints.

After arriving at work on February 11, 2019, Plaintiff discovered feces in the prisoners' restroom.  Plaintiff claims it is common knowledge that he cleans the library.  After complaints about those incidents, the medical staff canceled Plaintiff's psychiatric medications without notifying him, allegedly in retaliation for his complaints and as a malicious attempt to cause a mental breakdown or an outburst that would justify the staff's harassment.

Plaintiff next claims that on March 5, 2019, Defendant Stotts ordered Officer Anderson to tell Plaintiff he could not bring a bag to work.  Stotts allegedly had singled out Plaintiff, even though two other prisoners had bags.  Stotts also allegedly knew that Plaintiff carried his legal research in his bag.  Plaintiff argues that Stott's actions were retaliatory and an attempt to limit his ability to research his legal issues.  On March 14, 2019, Plaintiff's laundry bag allegedly was cut open and its contents were dumped out.  Then, on March 25, 2019, several library plants were mutilated.

On April 10, 2019, prison officials conducted a search and seizure of B Unit, supervised by Defendant Warden Breslin.  Breslin allegedly stated that the search was a punishment for some prisoners threatening other prisoners with violence.  Only Plaintiff's property was disturbed, and

he reported the incident to Unit Manager Todd Welch.  Welch said he was aware of the incident, and it had been addressed.  Plaintiff also complained to the Director.  He contends that because of his complaints, Ms. Allen, the library supervisor, notified him that he would be "job changed," at the direction of her supervisor.

On February 14, 2019, the Unit Manager notified Plaintiff that he had been placed on grievance restriction because of his repeated submissions of grievances.  Plaintiff argues the restriction was unwarranted and unreasonable, because each grievance concerned a different incident.  He also claims the restriction was done maliciously as punishment for past complaints and to restrict future complaints.

**Claim Two:**  Plaintiff next complains that prison officials violated the Fourth Amendment through unreasonable searches and seizures to harass prisoners for making complaints, to retaliate for past complaints, and to oppress future complaints.  He alleges the searches were not related to legitimate penological interests and violated the DOC Policy OP-040110 regarding Search and Seizure Standards.  He asserts the searches and seizures followed his complaints, and each subsequent complaint brought additional searches and seizures.

On October 23, 2018, a search and seizure immediately followed Plaintiff's complaints to Defendants Riley and Williamson.  The next day, another search and seizure was conducted following his complaint to Unit Manager Welch.  On February 7, 2019, a search left Plaintiff's property in disarray after he complained to Unit Manager Welch.  The warden allegedly supervised additional searches and seizures on  April 10, 2019; November 14, 2019; and December 6, 2019, with each incident leaving Plaintiff's property in disarray.

Plaintiff claims his seized property was not returned, and it instead was given to another

6

prisoner.  On December 19, 2018, the Warden stated he would replace one of Plaintiff's t-shirts that was seized by Defendant Riley, however, it was not replaced.  Plaintiff further complains that these incidents left his personal information and that of his family and friends exposed to other prisoners, putting them in danger.

Plaintiff next claims that on November 14, 2019, after two prisoners got into a fistfight, the Warden and Deputy Warden came to the pod and announced to all 75 prisoners that there would be a group punishment of a search and seizure.  The warden allegedly said that if they had a problem with the search and seizure, the prisoners should take it up with the two prisoners who had been fighting.  After the search, Plaintiff's property was disturbed, and shaving cream, lotion, and water was dumped on many prisoners' property.  When this fact was brought to the warden, he said to get out of his face.

**Claim Three:**  Plaintiff asserts prison officials routinely use threats and mass punishment to incite violence between prisoners, in violation of the Eighth Amendment.  On October 18, 2018, Defendants Riley and Williamson allegedly threatened a shakedown of Plaintiff's pod if he continued to complain.  Plaintiff contends the threat was a malicious and sadistic attempt to harm him by angering other prisoners.

During a December 19, 2018, meeting, the warden allegedly admitted he knew that threats and mass punishment can incite violence between prisoners, and he claimed he would speak to staff and replace Plaintiff's property.  The conversations with staff, however, resulted in further retaliations in December 2018, when Defendant Williamson identified Plaintiff as a "rat."  Plaintiff continued to complain, and prison officials began to harass him and his coworkers in the library.  The incidents included knocking over shelves of books and leaving feces in the prisoners'

bathroom, allegedly in an attempt to incite the coworkers to use violence against Plaintiff for his complaints.

**Claim Four:**  Plaintiff alleges prison officials violate the Eighth Amendment by not providing humane conditions of confinement in overcrowded facilities.  Plaintiff claims the prison has not had a laundry for more than three years, and prisoners' laundry is sent to OSP where it frequently is lost or stolen, requiring replacement.  He further asserts the unsanitary laundry facility returns wet and soiled clothes, resulting in Plaintiff's chronic illnesses of jock itch, athlete's foot, toenail fungus, and ringworm, in addition to exposing him to scabies and MRSA.  He allegedly has had to pay for medical treatments and purchase medications.

Plaintiff also complains that prison officials do not provide prisoners with adequate clothing, and the clothes that are provided have holes and stains.  At most, prisoners are issued three sets of clothing, and when Plaintiff arrived, he received only half a towel and a piece of a towel as a washcloth.  Prisoners allegedly are not issued suitable clothing to protect them from the elements, such as hats, gloves, and raincoats.  Plaintiff consequently has to purchase his own outerwear.

In addition, prison officials do not provide prisoners with good air quality.  Nonsmokers like Plaintiff are housed with smokers, forcing him to breath secondhand smoke from tobacco, marijuana, methamphetamine, PCP, etc.  Because the ventilation is inadequate, steam from the showers and odors from the bathroom intermingle with the smoke-laden air.  The poor air quality causes sinus and allergy problems, so Plaintiff has to pay medical fees and buy medications.

Plaintiff further alleges the prison bathroom is unsanitary and covered in mold.  It rarely is cleaned, because prisoners are not supplied with adequate cleaning supplies, personnel, and

supervision.  In addition, the prison allegedly is infested with roaches. Plaintiff claims the lack of sanitation results in frequent illnesses such as colds and flu.

Finally Plaintiff complains that prisoners are not paid a fair wage.  As a Level 4 prisoner, he is paid $15.00 per month, with $3.00 withheld for his savings account.  The remaining money allegedly does not cover the costs of health and hygiene items necessitated by the hazardous air quality and unsanitary conditions.  Medications and medical treatments cost more than a month's pay.  Prisoners also must pay for legal copies, fee, and mail.

**Standards of Review**

The pleading standard for all civil actions was articulated in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).  *See Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009).  To avoid dismissal for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a complaint must present factual allegations, assumed to be true, that "raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  The complaint also must contain "enough facts to state a claim to relief that is plausible on its face."  *Id*. at 570.  A court must accept all the well-pleaded allegations of the complaint as true, even if doubtful in fact, and must construe the allegations in the light most favorable to the plaintiff. *Id*. at 555-56. "So, when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," the cause of action should be dismissed.  *Id*. at 558.

A pro se plaintiff's complaint must be broadly construed under this standard.  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Haines v. Kerner*, 404 U.S. 519, 520 (1972).  The generous construction to be given to the pro se litigant's allegations, however, "does not relieve the plaintiff of the burden of alleging sufficient facts on which a recognized legal claim could be based."  *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). Notwithstanding a pro se plaintiff's various

mistakes or misunderstandings of legal doctrines or procedural requirements, "if a court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so . . . ." *Id*.  A reviewing court need not accept "mere conclusions characterizing pleaded facts." *Bryson v. City of Edmond*, 905 F.2d 1386, 1390 (10th Cir. 1990); *see also Twombly*, 550 U.S. at 555.  The Court "will not supply additional factual allegations to round out a plaintiff's complaint or construct a legal theory on a plaintiff's behalf." *Whitney v. New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997).

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute is genuine if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law." *Id.*  In making this determination, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.  A party opposing a motion for summary judgment, however, may not simply allege there are disputed issues of fact; rather, the party must support its assertions by citing to the record or by showing the moving party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c).  Thus, the inquiry for this Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

**Exhaustion of Administrative Remedies**

Defendants allege, among other things, that Plaintiff has failed to exhaust the administrative remedies for any of his claims.  "No action shall be brought with respect to prison

10

conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."   42 U.S.C. § 1997e(a).   Inmates are required to exhaust available administrative remedies, and suits filed before the exhaustion requirement is met must be dismissed.  *Booth v. Churner*, 532 U.S. 731, 740-41 (2001); *Yousef v. Reno*, 254 F.3d 1214, 1216 n.1 (10th Cir. 2001). "An inmate who begins the grievance process but does not complete it is barred from pursuing a § 1983 claim under PLRA for failure to exhaust his administrative remedies." *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002) (citation omitted).  In deciding a motion to dismiss based on nonexhaustion, the Court can consider the administrative materials submitted by the parties.  *See Steele v. Fed. Bureau of Prisons*, 355 F.3d 1204, 1212 (10th Cir. 2003), *abrogated in part on other grounds*, *Jones v. Bock*, 549 U.S. 199 (2007).

**DOC Grievance Process**

According to the special report, DOC Policy OP-090124, "Offender Grievance Process," governs offender complaints regarding incidences of prison life and sets forth the multi-step exhaustion process an offender must satisfy before filing suit.  [Dkt. No. 45-9]. An offender first must attempt to informally resolve his complaint by talking with the appropriate staff member.  *Id.* at 7-8.  If unsuccessful, the offender must submit a Request to Staff ("RTS") to the appropriate staff member.  *Id.* at 8-9.  If the offender's complaint remains unresolved, the offender may begin the formal grievance procedure by submitting a grievance to the Reviewing Authority.  *Id.* at 9-11.  If the grievance response fails to resolve the issue, the inmate can appeal to the Administrative Review Authority ("ARA"), or if the complaint raises a medical claim, to the Medical ARA.  *Id.* at 13-14.  Only after all of these steps are taken has the grievance process been exhausted.  *Id.* at

15-16.

**Plaintiff's Grievances**

Defendants assert Plaintiff has submitted numerous RTSs and grievances, however, he has failed to exhaust, or in some instances begin, the administrative remedies for all the claims raised in his amended complaint.

**Grievance No. 18-41:** On October 18, 2018, Plaintiff submitted an RTS, complaining that the laundry practices at JBCC were inhumane because of the lack of laundry service at the facility. He claimed his laundry sometimes was stolen or lost, and it routinely was returned soiled or wet, resulting in fungal infections that required medical care. In addition, the unit laundry was only open for short periods of time.  Plaintiff suggested that the DOC provide each unit at JBCC with laundry machines and detergent and issue each inmate five sets of clothing.  The response to the RTS advised Plaintiff that other laundry options were being investigated, but for the time being, the laundry would continue to go to OSP.  [Dkt. No. 45-10].  Plaintiff did not appeal the grievance response to the ARA.

**Grievance No. 18-44:** On October 24, 2018, Plaintiff submitted an RTS to the JBCC Deputy Warden, stating his laundry was returned wet from OSP.  Defendant Riley told Plaintiff to put away his wet laundry, and Plaintiff said he wanted to speak to the lieutenant. Riley allegedly cursed Plaintiff and threatened to shake everyone down unless Plaintiff shut up.  Plaintiff asked Defendant Williamson to call the lieutenant, but Williamson said the lieutenant would not speak to Plaintiff.  Riley and Williamson then confiscated some of the wet clothes from everyone who had not put them away.  Plaintiff contends that Riley and Williamson's threats and reprisals for Plaintiff's asking to speak to the lieutenant were attempts to incite a violent attack on Plaintiff by

other inmates.  Plaintiff requested the return of all confiscated clothing and that guards be required to wear body cameras.  In response, Plaintiff was advised that JBCC was looking at options regarding a better laundry system. [Dkt. No. 45-11].

On December 4, 2018, Plaintiff submitted a grievance on the issue.  He received partial relief on December 21, 2018, and was advised that the Unit Manager would contact Property to authorize replacement of a white t-shirt.  Also, the issue with staff harassment would be addressed and remedied.  Body cameras, however, are not a security measure supported by DOC policy. Plaintiff appealed the partial relief granted to the ARA, and on January 23, 2019, he received correspondence stating there was no basis for an appeal, because the reviewing authority had properly addressed the complaint, and partial relief was granted.  *Id.*

**Grievance No. 18-46:**  On December 5, 2018, Plaintiff submitted an RTS, complaining that on October 23, 2018, Defendant Riley improperly seized Plaintiff's t-shirt received from his family and gave it to another inmate.  Plaintiff contended the seized property should have been disposed of properly, so he should be reimbursed or the facility should adopt a procedure that allows inmates to send home any seized items.  The December 7, 2018, response stated that there already was a policy that grants inmates the option of mailing property home.  On December 7, 2018, Plaintiff filed a grievance with the additional complaint that his hobby craft items had been confiscated.  The grievance response stated that Plaintiff's hobby craft items would be returned from the contraband room to allow Plaintiff to ship them to his family.  [Dkt. No. 45-12].

**Grievance No. 18-49:**  On December 10, 2018, Plaintiff submitted an RTS to the Deputy Warden, claiming that the clothes he sent out for laundry had been lost or stolen.  He requested that JBCC replace his laundry bag, a yellow towel, three white t-shirts, three boxers, and three

pairs of socks.  He also asked to ensure that the shift supervisors address grievable issues and try to resolve them, instead of ignoring the inmates.  He was advised that Defendant Smith was aware of his concerns, and they were working to prevent loss of items sent out for laundry.  [Dkt. No. 47-13].

On December 21, 2018, Plaintiff submitted a grievance on this issue, requesting that JBCC reimburse or replace the lost items.  He was advised that the unit manager could provide gray items, but no towel.  After several conversations with Plaintiff and upon agreement, Property would provide one replacement t-shirt.  *Id.*

On January 29, 2019, Plaintiff received correspondence from the ARA indicating a need for further action/investigation and stating that an amended response would be provided. The ARA instructed that Plaintiff's RTS be returned to the Deputy Warden to specifically address what, if any, missing property will be replaced.

**Grievance No. 18-50:**   On December 22, 2018, Defendant Smith completed an Incident/Staff Report, stating that on that date he received a phone call from Plaintiff's father who wanted to speak with the warden.  Plaintiff's father decided to speak with Smith instead.  Plaintiff's father stated he had just received a phone call from Plaintiff who said that an officer had called him a "rat" in front of several other inmates, allegedly putting Plaintiff's life in jeopardy.  The father further stated that Plaintiff had filed a complaint against Officers Williamson and Riley, and the officers were retaliating.

Defendant Smith immediately notified the Chief of Security and then went to speak with Officers Williamson and Riley.  Both officers stated they had had no interaction with Plaintiff other than asking to see his ID at the 6 p.m. count.  Smith then listened to the phone calls Plaintiff

14

had made, and in the phone call to his father, Plaintiff stated that Williamson had called him a "rat" in front of the other inmates and that Plaintiff also was having issues with Riley.  In Plaintiff's second phone call to his father, Plaintiff said that Smith was in the control room where they were laughing and pointing at him.  Smith's report stated that while Smith was in the control room, at no time did any staff member laugh and point at Plaintiff.  Smith also watched the cameras on the unit and could not find anything that would support the allegations.  Smith further said Plaintiff had never approached him about any issues or concerns he was having.  [Dkt. No. 45-8].

Defendants Williamson and Riley also completed Incident/Staff Reports. Williamson's report stated Williamson had no interaction with Plaintiff on the date and time alleged.  Riley's report stated that on the date alleged, his only interaction with Plaintiff was to check Plaintiff's ID at the 6 p.m. count.  *Id.*

On December 27, 2018, Plaintiff submitted an emergency grievance, alleging that at the 6 p.m. count, Defendant Williamson walked straight to his rack, looked at him, and said, "I smell a rat."  This comment was directed toward Plaintiff in the presence of others, and Plaintiff claimed it was in retaliation for Plaintiff's grievances.  Plaintiff then had his father call to speak with the warden, but the father spoke with Lt. Smith.  During the 9 p.m. count, both Riley and Williamson allegedly stared at Plaintiff in another attempt to intimidate him. Lt. Smith failed to speak with Plaintiff or correct his officers.  Plaintiff further claimed that the abuse and harassment from Defendants Riley and Williamson were an attempt to incite other inmates to assault or kill him. *Id.*

On January 3, 2019, Plaintiff received partial relief for his emergency grievance.  The reviewing authority investigated Plaintiff's allegations and it was determined that no evidence or

15

witness statements supported Plaintiff's claims.  In addition, security camera footage was reviewed and also resulted in no substantiation of the allegations.  Security staff involved in the allegations were counseled about maintaining professional conduct while on duty.  *Id.*

Plaintiff appealed the partial relief granted.  On January 29, 2019, he received correspondence from the ARA informing him that his appeal was submitted improperly, because the reviewing authority conducted an investigation into his allegations and partial relief was granted.  Thus, there was no basis for an appeal.  *Id.*

**January 16, 2019, Inmate Request:**  On January 16, 2019, Plaintiff submitted an Inmate Request stating he no longer was allowed to bring his poncho and ice chest into the library, and this restriction was an act of "petty reprisal."  In response, Plaintiff was advised that no inmates are allowed to bring or store anything their workplaces, and enforcing established rules was not a petty reprisal against him.  Ponchos, however, are acceptable if it is raining.  Plaintiff did not appeal the RTS.  [Dkt. No. 45-24].

**Grievance No. 19-04:**  On January 23, 2019, Plaintiff submitted a similar RTS, claiming that he no longer was allowed to bring ice or a poncho to his job at the library. Plaintiff again claimed this restriction was retaliatory, and he requested that such reprisals from staff stop and that inmates be allowed to take ice and ponchos outside the unit.  The response stated that the action taken was not a reprisal or harassment but a rule that all inmates must follow. [Dkt. No. 45-14].

On January 28, 2019, Plaintiff filed a grievance requesting that JBCC change the rules to allow inmates to take ice, drinks, and ponchos to work.  In response, Plaintiff was advised that enforcement of established rules are not "petty reprisals," Plaintiff was permitted to bring his poncho to work if it is raining.  Therefore, partial relief was granted.  *Id.*

16

**Grievance Restriction:**   On February 13, 2019, Plaintiff was placed on grievance restriction for 12 months, based on the repeated submissions of RTSs and grievances about issues previously addressed by staff in written responses.  According to OP-090124, Section IX, "[t]he appropriate reviewing authority may determine there is abuse or misuse of the grievance process, and may restrict the inmate's/offender's ability to submit a grievance." Therefore, Plaintiff was required to follow steps outlined in Section IX of OP-090124 prior to submitting a grievance at any level.  [Dkt. No. 45-21].

**April 1, 2019 RTS:**   On April 1, 2019, Plaintiff submitted an RTS, complaining that a DOC employee yelled, cursed, and screamed at him and other inmates and closed the chow hall early.  The inmates were not allowed inside to eat.  Plaintiff further stated that prisoners cannot resolve complaints by talking to the supervising employee pursuant to DOC policy, when the guards refuse to call the lieutenant because they are in the wrong.  The April 2, 2019, response advised Plaintiff that video surveillance could not verify his allegations that the prison guard turned inmates away from the chow line or yelled at inmates.  [Dkt. No. 45-26].

**April 29, 2019 RTS:**  On December 12, 2018, the law library supervisor submitted a staff report stating she jokingly had asked Plaintiff if he wanted to be a law clerk, because he spent a lot of time in the law library instead of his assigned workplace in the leisure library.  On February 7, 2019, the law library supervisor asked Plaintiff to return to his assigned work station in the leisure library, because he was needed for his job duties.  The supervisor noted that Plaintiff was hanging out in the law library quite often and advised Plaintiff that he could work on his legal matters in the law library during count times when nobody needed assistance in the leisure library. [Dkt. No. 45-28].

On April 25, 2019, the law library supervisor submitted an Incident/Staff Report stating that on that date she informed Plaintiff that she was requesting a job change for him that might better suit him.  On April 29, 2019, Plaintiff submitted an RTS claiming he was fired from his job and reassigned to another job.  He alleged this obviously was done in retaliation for his grievances and lawsuit, because his supervisor had no complaints and had said he did a fine job. The response, however, advised Plaintiff that his supervisor had instructed him to get a job change because of his poor job performance, failure to remain in his job area, and over-familiarity with staff.  [Dkt. No. 45-27].

On April 30, 2019, the law library supervisor submitted an Incident/Staff Report stating her submission of a job change for Plaintiff was because of his over-familiarization with staff and repeated requests for him to return to his assigned work station in the leisure side of the library. The report indicated that on April 26, 2019, Plaintiff continued to hang out in the law library when he should have been at his work station in the leisure library and left without permission before his work shift ended.  *Id.*

**Grievance No. 19-23:**  On August 29, 2019, Plaintiff submitted an RTS stating that a prison official threw property around the pod during an unreasonable and improper search, in violation of DOC policy. The response advised Plaintiff that while his property may be in disarray after a search, there was no policy violation because no property was broken.  [Dkt. No. 45-22].

On September 10, 2019, Plaintiff submitted Grievance No. 19-23 concerning this issue. He requested that prisoners be protected from staff and that staff follow policy.  The grievance was returned unanswered, because it did not conform to DOC procedures for grievances filed while under restriction.  *Id.*

**Grievance No. 19-26:**  On November 4, 2019, Plaintiff submitted an RTS claiming that the air quality in B-Unit East 1 is "inhumane."  He asserted the dust and smoke in the air caused him sinus and lung congestion and aggravated his allergies.  He further claimed the exhaust fans did not remove the bathroom steam and odors.  Plaintiff requested that JBCC ensure prisoners have healthy, smoke-free and dust-free air.  In response, Plaintiff was advised that JBCC is operating within established standards for air quality, however, JBCC maintenance was contacted to ensure that all fans and vents were operational.  [Dkt. No. 45-29].

Plaintiff submitted Grievance No. 19-26 on this issue, again asserting the air quality was bad, and the HVAC had not worked in weeks.  In addition, the exhaust fans were not working for shower steam and bathroom odors.  The grievance was returned unanswered, because it did not conform to DOC procedures for grievances filed while under restriction. *Id.*

**January 16, 2019 RTS, April 1, 2019 RTS, and April 29, 2019 RTS:**  On these dates, Plaintiff submitted three different RTSs, alleging:  (1) his not being allowed to bring his poncho and ice chest was a "petty reprisal;" (2) a DOC employee yelled, cursed, and  screamed at several inmates; and (3) he was fired from his job in "obvious retaliation for grievances and lawsuit." [Dkt. Nos. 47-24, 47-26, 14-27].  Plaintiff was advised that DOC policy provides that no such items can be taken into the workplace, that video surveillance did not support his allegations regarding the irate DOC employee, and that his job change was requested by his supervisor because of poor job performance.  *Id.*  Plaintiff did not initiate grievances concerning these RTS responses.

**Retaliation Incidents**

Defendants allege Plaintiff has not exhausted the following retaliation incidents set forth in his amended complaint:  (1) February 11, 2019, alleging the staff left feces in the prisoner

19

restroom, knowing that he had to clean the library; (2) March 5, 2019, alleging he was singled out when he was not allowed to carry his bag to work; (3) March 14, 2019, alleging his laundry bag was cut open and the contents were dumped; (4) March 25, 2019, alleging several library plants were mutilated; and (5) April 10, 2019, alleging a search and seizure was conducted as punishment for prisoners.   [Dkt. 41 at 11-12].   Because Plaintiff failed to complete or even begin the administrative remedies for these alleged incidents of retaliation, they also are unexhausted.

**Plaintiff's Response to Defendants' Motion**

In his response to Defendants' motion, Plaintiff attempts to raise new claims and arguments, and he challenges the special report [Dkt. No. 52].  The Court, however, only will consider claims in Plaintiff's amended complaint.  As set forth above, Plaintiff's motion to file a second amended complaint [Dkt. No. 65] is denied, and the Court will not permit him to further amend his complaint through his response to the motion to dismiss or for summary judgment.

Plaintiff alleges in his response to the motion that PLRA exhaustion was met or did not apply because:  (1) administrative remedies were unavailable; (2) defendants waived exhaustion or were estopped from raising the defense; or (3) special circumstances, such as Plaintiff's misunderstanding of the grievance procedures, justified his failure to comply with the requirement. [Dkt. No. 52 at 4].  He claims Grievance Nos. 18-41 and 18-44 were exhausted when partial relief was granted.  *Id.* at 5.  He also claims that Grievance Nos. 18-46 and 19-04 were exhausted when relief was granted.  *Id.*  The defendants have not expressly responded to the issue of whether these claims were exhausted by the granting of partial or full relief.  Therefore, the Court will examine the merits of the claims in those grievances.  *See Miller v. Goodyear*, 822 F. App'x 725 (10th Cir. 2020) (noting that the ARA had rejected a prisoner's grievance because "an award of partial relief

could not be appealed."). *Id.* at 728.

With respect to Plaintiff's claim that he somehow was impeded from exhausting all his grievances, "[w]here prison officials prevent, thwart, or hinder a prisoner's efforts to avail himself of an administrative remedy, they render that remedy 'unavailable' and a court will excuse the prisoner's failure to exhaust." *Little v. Jones*, 607 F.3d 1245, 1250 (10th Cir. 2010) (citation omitted).   In Plaintiff's case, however, the Court finds he has provided only generalized, conclusory claims that he was harassed by Defendants.  He offers no specific allegations of how he was prevented from exhausting his administrative remedies.  He thus cannot be excused from exhaustion for his unexhausted grievances.  Accordingly, the Court finds Plaintiff has exhausted his claims in Grievance Nos. 18-41, 18-44, 18-46, and 19-04.  The claims in the other grievances are unexhausted, and those claims are **DISMISSED** for failure to exhaust administrative remedies pursuant to 42 U.S.C. § 1997e(a).

**Laundry Services**

In Grievance Nos. 18-41 and 18-44, Plaintiff complained about the conditions of his confinement with respect to the lack of laundry services at his facility.  "Conditions must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).  Conditions of confinement violate the prohibition against cruel and unusual punishment when "they result[] in unquestioned and serious deprivation of basic human needs." *Id.*  However, "[t]he Constitution . . . 'does not mandate comfortable prisons' and only those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991) (quoting

*Rhodes*, 452 U.S. at 349, 347).

An Eighth Amendment claim has both an objective and subjective component:  (1) a sufficiently grave deprivation of a basic human need; and (2) a sufficiently culpable state of mind. *Wilson*, 501 U.S. at 298.

> The objective component of an Eighth Amendment claim is therefore contextual and responsive to "contemporary standards of decency."  *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).  For instance, extreme deprivations are required to make out a conditions-of-confinement claim.   Because routine discomfort is "part of the penalty that criminal offenders pay for their offenses against society," *Rhodes*, 452 U.S. at 347, "only those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation."  *Wilson*, 501 U.S. at 298 (quoting *Rhodes*, 452 U.S. at 347) (citation omitted).

*Hudson v. McMillian*, 503 U.S. 1, 8-9 (1992).

The subjective component requires that the state actor acted with "deliberate indifference," that is, with a state of mind equivalent to a reckless disregard of a known risk of harm.  *See Farmer*, 511 U.S. at 835-36; *Wilson*, 501 U.S. at 303.  An inmate may satisfy the subjective component by demonstrating that prison officials knew of such substandard conditions or treatment and "acted or failed to act with deliberate indifference to a substantial risk of harm to inmate health or safety."

The Court first must address whether the laundry service at Plaintiff's facility constituted an extreme deprivation that satisfied the objective component of deliberate indifference.  In *Darris v. Mazzaie*, No. 12-cv-01559-RAB-CBS, 2018 WL 5291940 (D. Colo. Sept. 17, 2013) (unpublished), the Tenth Circuit found no constitutional violation when an inmate complained of wearing the same clothes for a week with no laundry services for undergarments.  *Id*., 2018 WL 5291940  at *9.  *See also Gates v. Cook*, 376 F.3d 323, 342 (5th Cir. 2004) (holding that prison laundry that required inmates to wash their own clothes with bar soap was not sufficiently serious

to constitute an Eighth Amendment violation); *Metcalf v. Veita*, No. 97-1691, 1998 WL 476254, at *2 (6th Cir. Aug. 3, 1998) (unpublished) (finding that plaintiff's complaints regarding insufficient showers, trash removal, cleaning, and laundry did not offend contemporary standards of decency); *Miller v. Brown*, No. 07-2020(JLL), 2007 WL 1876506 at * 4 (D.N.J. June 26, 2007) ("While any person's desire for spotless cleaning, perfect washing facilities and weekly laundry service is understandable, lack of such niceties cannot amount to a violation of constitutional magnitude.").

With respect to the laundry services at Plaintiff's facility, the Court finds Plaintiff has failed to meet the objective prong of the deliberate indifference test. Therefore, he has failed to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6).

**Searches and Seizures**

Plaintiff claims he suffered unlawful searches and seizures of his property in retaliation for his grievances and this lawsuit. In Grievance No. 18-44 he complained that on October 23, 2018, Defendant Riley threatened to search Plaintiff's pod, then confiscated some of the inmates' wet laundry that was hanging up to dry. After investigation, Plaintiff was notified that he would receive a replacement white t-shirt. [Dkt. No. 45-11].

In Grievance No. 18-46 Plaintiff alleged that Defendant Riley seized his t-shirt that had been sent by his family. He claimed the shirt was not disposed of properly, because it was given to another inmate. Plaintiff also complained that his hobby craft items (a scarf and a hat) had been confiscated. He was advised that there is a policy allowing inmates to mail property home, and Plaintiff would be allowed to ship the craft items to his family. [Dkt. No. 45-12].

To the extent Plaintiff is complaining about the confiscations, Defendants maintain that the

23

cell searches were conducted to investigate criminal behavior, inmate attacks, or policy violations regarding contraband, and there was no Fourth Amendment violation.  "A plaintiff's subjective beliefs about why the government took action, without facts to back up those beliefs, are not sufficient to create a genuine issue of fact.  *Nielander v. Bd. of Cty. Comm'rs*, 582 F.3d 1155, 1165 (10th Cir. 2009) (citation omitted).

Random and unauthorized deprivation of a prisoner's property does not violate due process, as long as a meaningful post-deprivation remedy is available.  *Winters v. Board of County Comm'rs*, 4 F.3d 848, 856-57 (10th Cir. 1993) (citing *Hudson v. Palmer*, 468 U.S. 517, 531-533 (1984); *Parratt v. Taylor*, 451 U.S. 527 (1981)).  Here, Plaintiff has failed to plead that any post-deprivation remedy for the loss of his property was inadequate.

After careful consideration of the pleadings and other submitted materials in this case, the Court is of the view that there are no genuine issues of material fact concerning whether the alleged searches and seizures were constitutional.  Therefore, Defendants' motion for summary judgment with respect to this claim [Dkt. No. 47] is **GRANTED**.

**Threats and Retaliation**

Finally, Plaintiff claimed in Grievance No. 18-44 that Defendant Riley cursed him and threatened to shake down everyone unless Plaintiff shut up about speaking to the lieutenant. Plaintiff asserts the threats and reprisals by Riley and Defendant Williamson were attempts to incite other inmates to attack him.  [Dkt. No. 45-11].  In Grievance No. 19-04 Plaintiff asserted that his restriction from bringing ice or a poncho to his job at the library was retaliation for his complaints about staff misconduct.  [Dkt. No. 45-14].  Defendants Williamson and Riley deny all allegations of retaliation against Plaintiff for his grievance submissions.  [Dkt. Nos. 45-6, 45-7].

"[P]rison officials may not retaliate against or harass an inmate because of the inmate's exercise of his constitutional rights. . . . [However], [a]n inmate claiming retaliation must allege *specific facts* showing retaliation because of the exercise of the prisoner's constitutional rights." *Fogle v. Pierson*, 435 F.3d 1252, 1263-64 (10th Cir.) (quoting *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998) (quotations omitted, emphasis in original), *cert. denied*, 549 U.S. 1059 (2006).  After careful review, the Court finds Plaintiff's conclusory allegations do not make this showing.

Further, "verbally abusive language, racial epithets, taunts, death threats, and deplorable language toward an inmate do not amount to a constitutional violation."  *Prejean v. Corr. Healthcare Co., Inc.*, No. 13-CV-111-JED-FHM, 2015 WL 711694 (N.D. Okla. Feb. 18, 2015). *See, e.g., McBride v. Deer*, 240 F.3d 1281, 1291, n. 3 (10th Cir.2001) (threats and verbal taunts do not violate the Eighth Amendment); *Collins  v. Cundy*, 603 F.2d 825, 827 (10th Cir.1979) (per curiam) (threats to hang a prisoner did not state a claim for constitutional deprivation under § 1983); *Northington v. Jackson*, 973 F.2d 1518, 1524 (10th Cir. 1992) (noting that among the actions "necessarily excluded from the cruel and unusual punishment inquiry" are "verbal threats and harassment").  The Court finds that after careful review of the pleadings and other submitted materials in this case, there are no genuine issues of material fact concerning whether Defendants unconstitutionally retaliated or threatened Plaintiff.  Therefore, Defendants' motion for summary judgment with respect to this claim [Dkt. No. 47] is **GRANTED**.

**Injunctive Relief**

Plaintiff also has asked the Court to declare that Defendants violated his constitutional rights and to issue injunctive relief requiring Defendants to conform with certain behavior and to

provide in-house laundry facilities, body cameras for all prison officials, anger management and conflict resolution training for officials, and to provide prisoners with five sets of clothing and outerwear.  [Dkt. No. 41 at 17].  He also asks that Defendants surrender any credentials that permit them to work as law enforcement or corrections officers and that all defendants be permanently barred from working in law enforcement, corrections, or as government officials.  *Id.*  In addition, he requests the development and implementation of plans for accountability, transparency, and victim notification to hold prison officials accountable for misconduct.  *Id.*  Finally, Plaintiff asks that prisoners' monthly wage be increased to a minimum of $160.00 per month.  *Id.*

"An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course."  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010).  Furthermore, to be entitled to injunctive relief, the movant must establish a violation of his constitutional rights. *Rizzo v. Goode*, 423 U.S. 362, 377 (1976).  Because the Court finds Plaintiff has failed to establish that his constitutional rights have been violated, his requests for declaratory and injunctive relief must be **DENIED**.

**THEREFORE,**

1.    Plaintiff's motion to file his proposed amended complaint [Dkt. No. 65] and his motion to file an extended brief [Dkt. No. 66] are **DENIED**.

2.    Defendants' motion to dismiss Plaintiff's claim regarding laundry services [Dkt. No. 47] is **GRANTED**.

3.    Defendants' motion for summary judgment with respect to the alleged searches and seizures, threats, and retaliation [Dkt. No. 47] is **GRANTED**.

4.    Plaintiff's request for injunctive relief is **DENIED**.

5.      This dismissal shall count as a **"PRIOR OCCASION" or "STRIKE,"** pursuant to 28 U.S.C. § 1915(g).

**IT IS SO ORDERED** this 29th day of March 2021.

JOHN F. HEIL, III
UNITED STATES DISTRICT JUDGE